**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| MONICA ACERRA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TRULIEVE CANNIBS CORP., et al.,<br><br>Defendants. | Master File No. 4:20cv186-RH-MJF<br><br><br>Hon. Robert L. Hinkle<br>**Jury Trial Demanded** |

**Memorandum of Law in Opposition to Motion to Dismiss**

## Contents

I.   Introduction ..................................................................................................1

II.  Background ...................................................................................................2

   A.   Industry Background .............................................................................2

   B.   Trulieve's True Operation – Low Quality Outdoor Hoop Houses ...............7

¶16. ...............................................................................................................10

   C.   The Truth Begins to Emerge ...............................................................13

III.  Argument ..................................................................................................16

   A.   The Parties' Transactions in Trulieve Securities are Domestic Transactions
under Morrison ........................................................................................17

   B.   Trulieve's Claim to Grow Cannabis in Greenhouse Style Grows is
Materially False ......................................................................................19

      1.   The Hoop Houses Trulieve Refers to are not Greenhouse Like ..............19

      2.   Defendants' Claim that Plaintiffs are Required to show Widespread Mold
Issues in Trulieve's Smokeable Flower is Without Merit .............................21

      3.   The Complaint Properly Alleges that Defendants Failed to Disclose
Related Party Transactions and Omitted Material Facts About Related Party
Transactions. ..........................................................................................27

   C.   The Complaint Alleges Undisclosed Related Party Transactions .............27

   D.   The Complaint Alleges Scienter .........................................................29

      1.   Trulieve's Related Party Transactions with Rivers' Husband Create a
Motive for Rivers to Commit Fraud ..........................................................32

   E.   The Complaint Alleges Control Person Liability.....................................34

IV.  Conclusion ................................................................................................34

Cases

*Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012)...19

*ACA Fin. Guar. Corp. v. Advest Inc.*, 512 F.3d 46 (1st Cir. 2008) .........................30

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999)........................ 17, 23

*Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006) ...........................17

*In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546 WHP, 2004 WL 2190357 (S.D.N.Y. Sept.30, 2004) .................................................................................................24

*In re Carter–Wallace Inc. Sec. Litig.*, 150 F.3d 153 (2d Cir.1998)........................26

*In re China Valves Tech. Sec. Litig.*, No. 11 CIV. 0796 LAK, 2012 WL 4039852, at *7 (S.D.N.Y. Sept. 12, 2012) .........................................................................29

*In re Clarus Corp. Sec., Litig.*, 201 F. Supp. 2d 1244, 1251 (N.D. Ga. 2002)........32

*In re JDN Realty Corp. Sec. Litig.*, 182 F. Supp. 2d 1230 (N.D. Ga. 2002) ...........31

*In re LDK Solar Secs. Litig.*, 584 F. Supp. 2d 1230 (N.D. Cal. 2008) ....................17

*In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016 (D. Minn. 2009) ...............24

*In re Netbank, Inc. Sec. Litig.*, No. CIV.A.1:07-CV-2298, 2009 WL 2432359 (N.D. Ga. Jan. 29, 2009) ......................................................................................31

*In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351 (N.D. Ga. 2002).. 30, 31

*In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159  (S.D. Fla. 2004) ...............32

*In re Terravia Holdings*, Inc. Sec. Litig., No. 16-CV-06633-JD, 2020 WL 553939 (N.D. Cal. Feb. 4, 2020)...............................................................................26

*Inst. Inv. Group v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009).........................30

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009)...............................30

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011) ................................................................. 24, 27, 30, 31

*McCurdy v. S.E.C.*, 396 F.3d 1258 (D.C. Cir. 2005)..............................................33

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010) .......................................................................................17

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) .......................................................26

*S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233 (11th Cir. 2012) ........................25

*Salters v. Beam Suntory, Inc.*, No. 4:14CV659-RH/CAS, 2015 WL 2124939 (N.D. Fla. May 1, 2015).................................................................................20

*Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219 (S.D. Fla. 2007) .............................31

*Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009)...................26

*Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010)......................................30

*Sulzer v. Associated Madison Companies, Inc.*, No. 84-516-CIV-3-12, 1985 WL 5856 (M.D. Fla. May 10, 1985).......................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).................. 16, 29

*United States v. Isaacson*, 752 F.3d 1291, (11th Cir. 2014)...................................18

*Zagami v. Nat. Health Trends Corp.*, 540 F. Supp. 2d 705 (N.D. Tex. 2008)........29

*Zell v. Intercapital Income Securities, Inc.*, 675 F.2d 1041 (9th Cir. 1982) ...........22

Other Authorities

3 CCR § 1472.8...............................................................................................20

## I.      <u>Introduction</u>

Trulieve is a "seed to sale" cannabis grower and seller in the state of Florida. Trulieve told investors that it grows a majority of its product in 1.1 million square feet of "greenhouse style" facilities, and indicated that they had a sophisticated and fine-grained system of climate monitoring to ensure maximum crop yield.  Instead, Trulieve actually built 1.1 million square feet of rudimentary "hoop houses" that lacked climate control capabilities and therefore rendered Trulieve's crops vulnerable to mold contamination.  By misleading investors about the nature of the buildings they were erecting, Trulieve CEO Kim Rivers was able to direct tens of millions of dollars in construction fees to her husband, J.T. Burnette, who is currently awaiting trial on federal racketeering charges.

Defendants' motion to dismiss does not point to any legitimate ground for dismissal.  Defendants, refusing to confine their argument to the four corners of the pleading, assert without evidence that the use of hoop houses is immaterial to investors because Trulieve only used hoop house grown cannabis to produce concentrates, and Defendants further assert without evidence that their method for producing concentrates somehow is capable of removing all mold contamination. Defendants also argue that Plaintiffs fail to allege a proper motive to commit fraud, ignoring the fact that the existence of extensive related party transactions inherently creates a motive to commit fraud.

## II.    Background

### A.    Industry Background

Cannabis is a genus of flowering plant that naturally contains a variety of chemicals called cannabinoids. ¶1. Several cannabinoids, most notably Tetrahydrocannabinol ("THC"), are psychoactive, and are concentrated in the flower of the cannabis plant. *Id.* The amount of THC contained within a particular cannabis plant varies according to the strain of plant used as well as the growing environment, particularly the amount of ultraviolet light that a plant is exposed to. *Id.*

Also important to the growing of marijuana is climate control, particularly the control of humidity. ¶2. Excess humidity can cause mold to grow on marijuana flowers, according to The Weed Blog, a website containing news and information about the marijuana industry. *Id.* https://theweedblog.com/growing/a-fungus-among-us-how-humidity-control-keeps-bud-rot-at-bay. *Id.*

Consumption of marijuana mold can be deadly for people with a compromised immune system or severe respiratory problems, and among healthy people can cause coughing, wheezing, stuffy nose, itchy eyes, fever, shortness of breath, memory loss, or lethargy, according to the medical marijuana website Green Health Docs. ¶3 https://greenhealthdocs.com/avoid-marijuana-mold/. *Id.* Marijuana mold also degrades cannabinoids in marijuana flower, reducing the potency of the

product. *Id.* As the University of Florida Institute For Agricultural Studies Extension notes, mold thrives in humid environments, and Florida is humid throughout much of the year. *Id.* https://sfyl.ifas.ufl.edu/archive/hot_topics/families_and_consumers/clean_mold.shtml. *Id.*

In order to prevent excess humidity and to otherwise control the climate in which marijuana grows, marijuana cultivators typically cultivate marijuana in indoor facilities with artificial lighting, or in outdoor greenhouses that use natural light but contain climate control equipment to regulate temperature and humidity. ¶4.

### History of Trulieve

Trulieve describes itself as a vertically integrated "seed to sale" cannabis business, meaning that they grow, distribute and sell to the end user cannabis products. ¶5. Trulieve sells marijuana products in the State of Florida, which legalized the consumption of marijuana for medical purposes with the passage of Florida Amendment 2 in 2016. ¶6. Under Amendment 2, a patient may only consume marijuana with a doctor's recommendation for the treatment of cancer, epilepsy, glaucoma, positive status for human immunodeficiency virus (HIV), acquired immune deficiency syndrome (AIDS), post-traumatic stress disorder (PTSD), amyotrophic lateral sclerosis (ALS), Crohn's disease, Parkinson's disease,

multiple sclerosis, chronic nonmalignant pain caused by a qualifying medical condition or that originates from a qualified medical condition, or other comparable debilitating medical conditions. *Id.* Initially, Florida regulations under Amendment 2 prohibited the smoking of marijuana, requiring that it be consumed by some other means. *Id.* The Florida legislature repealed this restriction in March of 2019. *Id.*

The predecessor company to Trulieve, Trulieve, Inc., received approval from the Florida Department of Health to begin cannabis cultivation on February 26, 2016. ¶7. On July 19, 2016 Trulieve, Inc. received approval to begin processing activities. On July 20, 2016 Trulieve, Inc. received approval to begin dispensing products. *Id.* On July 23, 2016, Trulieve, Inc. became the first company to sell medical marijuana products in Florida via home delivery. Three days later, Trulieve, Inc. opened the first medical marijuana dispensary in Florida. *Id.*

On July 18, 2018 Trulieve Inc. and Schyan Explortation Inc. entered into a letter agreement to merge the two companies resulting in a reverse takeover of the company by Trulieve. ¶8. That merger was completed, resulting in the formation of Trulieve, and at the same time, on September 25, 2018, Trulieve filed a listing statement with the Canadian Securities Exchange, allowing Trulieve to list on that exchange. *Id.* Trulieve began trading on the OTC Pink market at the same time, and on August 6, 2019 graduated to the OTCQX  Best Market.  *Id.*

Trulieve sells two types of cannabis products: "flower" products, which

contain unprocessed marijuana plant matter from the cannabis flower, and products

containing THC concentrates. ¶9. Concentrates, as the name implies, are oil based

extracts containing high concentrations of THC oil. *Id.*

Trulieve claims that it grows its cannabis in two types of facilities: indoor

facilities and outdoor greenhouses. ¶10. Trulieve has stressed the importance of

climate control to a successful grow operation. *Id.*

> In its cultivation activities, Trulieve uses data analytics to record, monitor, communicate and optimize the yield potential of each harvest of cannabis by strain. Daily logs are recorded on a cloud-hosted database to capture such metrics as nutrient application, temperature, humidity, CO2 levels, light intensity, light duration, grow medium pH and grow medium Electro-Conductivity (EC) at various locations within each growing room. Trulieve considers these data sets as the harvest vitals that are continuously monitored to ensure peak performance of each strain maintained by Trulieve. At harvest, the cultivation log is paired with the room's daily log and analyzed against previous harvests of the same strain in an effort to ensure consistency of products.

As of September 25, 2018, Trulieve operated 468,000 square feet of

cultivation facilities across three sites, according to the Listing Statement filed on

that date. ¶11. As of October 31, 2019, Trulieve US operated over 1,684,408 square

feet of cultivation facilities across five sites, according to Trulieve's Management

Discussion and Analysis of Interim Financial Statements dated November 18, 2019.

*Id.*

One of the original growing facilities was a property at 6749 Ben Bostick Rd

5

in Quincy, Florida, that Trulieve had purchased in June of 2018 from One More

Wish, LLC. ¶12. The owner of One More Wish, LLC is JT Burnette, the husband

of Kim Rivers. *Id.* Burnette is currently awaiting trial on federal criminal charges in

the Northern District of Florida. *Id.* According to property records, One More Wish

LLC purchased the property from another company, called Big Wish LLC, for

$1,200,000 in April of 2017, and re-sold the property to Trulieve for $2,170,000, a

nearly 100% premium. According to a Trulieve fact sheet

> At acquisition by One More Wish, the property consisted of bare land
> and a shell warehouse. The property underwent significant
> improvement and was utilized as Trulieve's sole cultivation and
> processing facility at the time. Trulieve initially rented the property and
> acquired the property in June 2018 for $2,170,000. That price reflected
> the cost basis in the land as well as the cost of subsequent improvements
> between April 2017 and June 2018.

Despite Trulieve's claims that the increase in price reflected improvements

to the land, real estate records show no buildings or improvements to the property

were completed in 2017 or 2018. ¶13. Rather, the only buildings listed in the

property's public records were built in 1994 and 2019. *Id.* None of the other property

features such as fences, gates, sheds etc. were listed as having been built in 2017 or

2018. *Id.* That is, no new buildings or improvements were listed as being

constructed during the time period that One More Wish, LLC owned the property.

*Id.* Trulieve also has retained the services of Burnette's construction company,

6

Burnette Construction and Development Inc. paying them $8.7 million in 2018 and $28 million in the first three quarters of 2019. ¶14.

### B.  Trulieve's True Operation – Low Quality Outdoor Hoop Houses

The term "hoop house" refers to rudimentary greenhouse like structures that, unlike greenhouses, lack climate control features. As the website Sustainable Agricultue Research and Education explains, "High tunnels, or hoop houses, are simple greenhouse-like structures over bare ground, without the elaborate heating and cooling systems of a greenhouse." ¶15. https://www.sare.org/Learning-Center/Topic-Rooms/High-Tunnels-and-Other-Season-Extension-Techniques. Hoophouses have clear plastic roofs but the walls are open to the elements. Greenhouses are built of glass, are completely enclosed on all sides, and have sophisticated climate control equipment.  (attach or link photo)

The investment firm Grizzly Research ("Grizzly") has issued a report (the "Grizzly Report") revealing that Trulieve did not actually use greenhouses as it claimed, but actually relied on hoop houses. Grizzly provided the following photos:

7







¶16.

As noted above, the use of hoop houses is unsuitable for growing cannabis in a humid location such as Florida.  ¶17. As a result, Trulieve has had its harvests contaminated with mold and, as a result, sold marijuana products contaminated by mold on several occasions. *Id.* The Grizzly report found one sample of Trulieve flower containing such mold:



Internet research has revealed many other customers having issues with mold. The facebook account "420watchdog" posted the below screenshot on June 10, 2020 revealing that Trulieve recalled a batch of "Blue Sunshine" flower due to customer complaints of mold.  ¶18

11

> **Kevin :** Quality and patient safety are our highest priorities. Blue Sunshine batch DUFL-BLD-24-PK-4 has been reported on social media to have mold however, internal and 3rd party lab test results do not indicate mold contamination. Out of an abundance of safety precautions, it has been pulled from shelves at all locations. As a reminder, Trulieve product may be exchanged at any time and for any reason. 3rd-party lab reports are available for each and every batch of Trulieve products on our website here: https://www.trulieve.com/patients/product-test-search
>
> 8:55

> ⬛⬛⬛⬛⬛⬛ **:** So should I return or do u think it's safe for me to smoke
>
> 8:56

> **Kevin :** That is up to you!
>
> 8:57

On January 14, 2020, a user of the website reddit reported purchasing Trulieve flower of the "white buffalo" strain that was contaminated by mold and caused him to be hospitalized for breathing issues and caused him to experience

12

delirium. ¶19.

C.    **The Truth Begins to Emerge**

On December 17, 2019, while the market was open, Grizzly published a

report explaining that the vast majority of the Company's marijuana was produced

in low quality hoop houses and had failed to disclose related party transactions. ¶64.

The report also explained that the author had researched Trulieve's manufacturing

facilities and found that the vast majority of its cultivation facilities were "low-

quality hoop houses" that were prone to infestations and weather damage:

> When we visited [Trulieve's facility], we found a huge row facility with
> 9 foot chain linked fences with barbed wire at the top, security cameras
> and armed guards. Hackney nursey is in Quincy, we were told by locals
> that Trulieve has hired about half of the small town. All the facilities
> have just gone up in the past year, and they flew a grow expert in from
> California to oversee the operation.

> We estimate this area of hoop houses to cover at least 430,000 and
> 1,010,000 square feet per location, which would combined make up the
> vast majority of Trulieve's cultivation surface. We believe that Trulieve
> has been supplementing if not getting most of their marijuana supply
> from these low-quality outdoor production hubs.

> Florida is the most humid state in the U.S. Tallahassee has an average
> humidity level of 75% which is too high for every step of cannabis
> growth. While cannabis plants don't usually die from the heat, too hot
> temps will cause plants to grow much more slowly.

> Trulieve's government-mandated obligation to the medical patients of
> Florida is to provide a safe, clean, and efficacious offering of medical
> cannabis treatment options. Cultivation of safe and high-quality

13

cannabis in a humid, equatorial microclimate such as Florida requires careful selection of genetics, environmental controls, IPM (integrated pest management), and harvesting practices. The aforementioned variables are critically interconnected whether you are cultivating indoors in an enclosed warehouse, in an enclosed greenhouse, or in Trulieve's case, a large tranch of open hoophouses.

As Florida is the most humid state in the U.S. it is a geographical outlier within the greater United States. If one is to cultivate cannabis exposed to the local environment, careful care must be taken to cultivate cannabis genetics that are acclimated to the local microclimate and to provide specialized, vigilant protection to plants throughout the growth cycle. If hoop house cultivation is quickly and reactively implemented to supplement low performance at existing warehouse facilities, the outcome will most likely be a low quality and in this case, dangerous end product.

Many plant diseases conducive to Florida's humid environment greatly increase health risks to humans when consumed, namely *Botrytis cinerea* (grey mold). Combusting and/or inhaling grey mold can worsen symptoms of asthma and induce lung infections along with multiple autoimmune diseases (of which many are qualifying conditions to become a Florida medical cannabis patient, in a bit of tragic irony).

¶65

The report also included an example of moldy Trulieve product. ¶66. The report went on to explain that because the Company's markups on biological assets were likely inflated as a result:

Trulieve sports unbelievable gross margins of 130% on average. This is mainly due to the biological assets fair value adjustment that is

14

widely adopted within the industry. However, Trulieve seems to be aggressively using this accounting method towards its benefit to inflate its gross profit and margins.

*     *     *

Upon closer inspection we realize that at any given time, Trulieve holds an abnormally large amount of biological assets. Biological assets should typically be used to support revenue. However, we are seeing that Trulieve's biological assets utilization efficiency is relatively low compared to peers. In other words, for every dollar in biological assets, Trulieve is able to generate the least amount of dollar sales. This strongly suggests that the mark-up on these assets is overstated.

¶67.

Regarding related party transactions, the Grizzly Report disclosed the following:

It is noteworthy that the company lies about, or at least obfuscates the nature of certain lenders.

***Track V LLC*** issued a $6m loan in January 2018 to Trulieve, but this loan is listed as belonging to an unrelated party per Note 5 in the 2018 third quarter financial statements.

Track V, LLC lists Anna Bruno and Virginia Hines as directors and agent. Virginia Hines is closely related to Ben Aktins, and was actually the In-House Counsel for Trulieve from May 2017 to May 2019. We see that this company was incorporated days before the loan was issued, on Jan 9, 2018. Trulieve also discloses the relationship between Track V and Atkins in the annual report ownership table.

The company lied in its listing statement about this note belonging to an unrelated party.

15

Another lender, called ***Vandagraff One LLC***, is consistently disclosed as a third party, but traces back to Trulieve insiders. Vandagraff provided $2M loan in December 7, 2017. The loan became due on demand following the SR offering. The pattern we see once again is that the company was founded once again just days prior to the loan being issued, on November 13, 2017. Vandagraff can't be traced back to an investor group, doesn't show a website, or a parent company. Vandagraff lists it's address as 24671 US HWY 19 N, CLEARWATER, FL, 33763, which is the property directly next to Trulieve Clearwater. This is also in fact the same exact address related party Track V uses. We don't believe this to be a coincident and think that Trulieve has on purpose disguised a related party loan as coming from a third party.

¶68

In short, Grizzly discovered that Trulieve's facilities consisted largely in low quality hoop houses rather than the promised climate controlled greenhouses. This, unsurprisingly, led to Trulieve selling moldy product to customers, and also led to a lower level of revenue from their biological assets than other cannabis companies, as the lack of climate control led to less consistency of product.

## III.   <u>Argument</u>

In a PSLRA case, as on any motion to dismiss, the Court must accept all well-pled factual allegations as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "The PSLRA in no way turns FRCP 12 into a trial-type, papers-only proceeding, much less one in which defendants get the benefit of every

conceivable doubt, including credibility calls." *In re LDK Solar Secs. Litig.*, 584 F. Supp. 2d 1230, 1260 (N.D. Cal. 2008). "To allege securities fraud under Rule 10b–5, a plaintiff must show: 1) a misstatement or omission, 2) of a material fact, 3) made with scienter, 4) on which plaintiff relied, 5) that proximately caused his injury." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir. 1999). Under the PSLRA, to plead falsity, a Complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).

### A.    The Parties' Transactions in Trulieve Securities are Domestic Transactions under Morrison

Defendants claim that Plaintiffs fail to allege that their transactions in Trulieve securities were within the jurisdiction of the United States courts under *Morrison v. National Australia Bank, Ltd. Morrison* held that Section 10(b) of the Exchange Act does not apply extraterritorially, and therefore only applies to securities that are listed on a US exchange, or domestic transactions in securities not so listed. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 253, 130 S. Ct. 2869, 2877, 177 L. Ed. 2d 535 (2010). Defendants point out that Trulieve stock is listed on the OTCQX, and they argue that it is not a domestic securities exchange.

However, the facts alleged in the complaint establish a nexus with the US

17

sufficient to warrant application of the Exchange Act to the transactions at issue here. The Eleventh Circuit has already found that the OTC Bulletin Board and the OTC Pink Sheets are sufficiently similar to domestic US Exchanges to create a domestic nexus to transactions in securities that traded on those markets. *United States v. Isaacson*, 752 F.3d 1291, 1299 (11th Cir. 2014) (upholding criminal conviction as showing sufficient US nexus under *Morrison*). The OTCQX is similar to the OTC Bulletin Boards and OTC Pink Sheets but applies higher financial standards for listing. https://www.otcmarkets.com/glossary. Moreover, *Isaacson* also found that a purchaser's residence in the US similarly supports a domestic nexus, *Id.* and as seen by the unredacted PSLRA certifications, filed under seal herewith as exhibit 3 to the declaration of Jonathan Stern ("Stern Dec."), all plaintiffs listed US addresses. The OTCQX is located in New York. https://backend.otcmarkets.com/otcapi/company/financial-report/241298/content. Its computer and data centers, where the stock trades are processed, are all located in New York. *Id.* Therefore, all transactions on the OTCQX occur in the US.

Rather than apply the Eleventh Circuit's holding in *Isaacson*, Defendants cite to Second Circuit authority that they claim renders the complaint insufficient. Yet Defendants cite no authority for the proposition that the Eleventh Circuit adopted the Second Circuit's standard, or that the Second Circuit requires some sort of specific showing that is absent here. While Defendants cite the Second Circuit as

18

stating that, within the Eleventh Circuit, "in order to survive a motion to dismiss premised on *Morrison*, it is *sufficient* for the plaintiff to allege that title to the shares was transferred within the United States", Defendants do not point to any authority that this exact phrasing is *necessary*. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). While Defendants cite to authority showing that the Third and Ninth Circuits have adopted the *Absolute Activist* test, they cite no authority that the *Eleventh* circuit has done so, or that anything within a Second Circuit decision could supersede the authority in this Court of *Isaacson*, an Eleventh Circuit opinion. And the facts in this action squarely establish jurisdiction under the *Isaacson* test.

### B.   Trulieve's Claim to Grow Cannabis in Greenhouse Style Grows is Materially False

#### 1.   The Hoop Houses Trulieve Refers to are not Greenhouse Like

The Complaint alleges that Defendants misled investors by claiming that Trulieve operated "greenhouse style grows" when in reality it operated non-climate-controlled hoop houses.  Though Defendants concede that it did in fact operate non-climate-controlled hoop houses, they claim that the Complaint alleges no basis for concluding that these non-climate controlled structures could not accurately be described as "greenhouse style grows." In doing so Defendants wholly ignore the fact that the Complaint cites third party authority stating that a "greenhouse" refers

to a climate controlled structure.

In reality, the Complaint provides a more than sufficient basis under applicable pleading standards to establish that Defendants' use of the term "greenhouse" was misleading when used to refer to hoop houses. Whether a statement is false or misleading is ordinarily a question of fact, unless it is implausible that a reasonable juror would find a particular statement false or misleading. *Salters v. Beam Suntory, Inc.*, No. 4:14CV659-RH/CAS, 2015 WL 2124939, at *2 (N.D. Fla. May 1, 2015). The Complaint cites the website "Sustainable Agriculture Research and Education" for the proposition that hoop houses are distinguishable from Greenhouses in that hoop houses lack climate control facilities. Other legal definitions of a greenhouse exclude non-climate controlled facilities, for instance California agricultural regulations: "Tomatoes labeled with the term 'greenhouse grown' shall be considered mislabeled unless tomatoes are grown in a fixed steel structure using irrigation and climate control, in an artificial medium that substitutes for soil." 3 CCR § 1472.8. It is therefore plausible that a reasonable investor would have interpreted Trulieve's statements that its products were grown in greenhouse-style grows to be a statement that they were grown in climate controlled facilities.

Further supporting Plaintiffs' position that a reasonable investor would have understood "greenhouse" to refer to climate controlled facilities is the fact that

20

Defendants described a sophisticated system of climate monitoring including daily logging of "nutrient application, temperature, humidity, carbon dioxide levels, light intensity, light duration, grow medium pH and grow medium electro-conductivity at various locations within each growing room." ¶11 This would confirm for a reasonable investor what the use of the term "greenhouse" itself indicates – that Trulieve had the ability to *control* the climate measurements that Trulieve claims are so important.

Further undercutting Defendants' argument is the fact that Trulieve's website *currently* tells customers that "Our plants are hand-grown in a facility with a controlled environment specially designed to reduce unwanted chemicals and pests, keeping the process as natural as possible at every turn." Stern Dec. Ex. 1. Defendants' admission in their motion to dismiss that they grow product in a non controlled environment directly undercuts information that Defendants currently provide to their own customers regarding the safety of a medical product.

### 2.    Defendants' Claim that Plaintiffs are Required to show Widespread Mold Issues in Trulieve's Smokeable Flower is Without Merit

Defendants argue that the use of non-climate-controlled hoop houses was immaterial because Plaintiffs could not show any systemic pattern of Trulieve selling mold-contaminated smokable flower to customers. Because materiality is a mixed question of law and fact, "issues of materiality may be resolved on a motion

to dismiss only if the omitted fact is 'so obviously unimportant that no reasonable shareholder could have viewed it as significantly altering the 'total mix' of information made available to stockholders.'" *Sulzer v. Associated Madison Companies, Inc.*, No. 84-516-CIV-3-12, 1985 WL 5856, at \*2 (M.D. Fla. May 10, 1985) *quoting Zell v. Intercapital Income Securities, Inc.*, 675 F.2d 1041, 1045 (9th Cir. 1982). Defendants do not explain why the level of mold contamination already alleged in the complaint is insufficient to render it plausible that a reasonable investor would consider it material.

Defendants also argue that Trulieve's use of non-climate controlled hoop houses is immaterial because, according to Trulieve, they only used the resulting moldy product to produce cannabis oil, and that their process for creating such oil removes any resulting toxic contamination. For this proposition, Defendants ask the Court to take judicial notice of Trulieve's fact sheet, issued in response to the Grizzly Report. But this is improper.  While it is appropriate to take notice of the fact that Trulieve made this statement, it is not appropriate, in an action alleging fraud, to take a defendants' unverified and potentially false exculpatory statements as proof of the fact asserted therein.  The Eleventh Circuit has stated that "a court, when considering a motion to dismiss in a securities fraud case, may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents".

22

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999). Thus, Defendants have offered the Court no basis to conclude that its hoop-house grown product was only used in producing oil, or that their process for making oil removes any contaminants.

Moreover, even if it were the case that Trulieve only used hoop house grown cannabis for oil and that its oil manufacturing process removed any contaminants, the use of hoop houses rather than climate controlled greenhouses is nonetheless material because, as Defendants themselves acknowledged in their statements to investors, growing climate can heavily impact crop yield. As Trulieve stated in its Annual Information Form dated April 10, 2019,

> In its cultivation activities, Trulieve US uses data analytics to record, monitor, communicate and optimize the yield potential of each harvest of cannabis by strain. Daily logs are recorded on a cloud hosted database to capture such metrics as nutrient application, temperature, humidity, carbon dioxide levels, light intensity, light duration, grow medium pH and grow medium electro-conductivity at various locations within each growing room. These data sets are continuously monitored to ensure peak performance of each strain maintained by the Corporation. At harvest, the cultivation log is paired with the room's daily log and analyzed against previous harvests of the same strain to ensure consistency of products.

¶10.

Climate monitoring, and by extension climate control, is by Trulieve's own admission essential to achieving optimal crop yield. And there is little purpose in

23

closely monitoring climate as Trulieve claims to if they cannot actually do anything about a sub-optimal climate. Therefore any reasonable investor would have understood "greenhouse" to refer to a climate controlled structure, and would have considered that fact to be material to their assessment of Trulieve's profitability and the value of the company as a whole.

Defendants also argue that even if the hoop house grown cannabis was sold in the form of smokable flower, and that this resulted in the instances of mold contamination set forth in the Complaint, that such allegations are immaterial as a matter of law because they do not present statistically significant evidence of mold contamination. "Statistical significance, however, is not a bright-line rule because materiality 'is a flexible, fact-based determination.'" *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1024 (D. Minn. 2009), *quoting In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546 WHP, 2004 WL 2190357, at *9 (S.D.N.Y. Sept.30, 2004). The Supreme Court, in *Matrixx Initiatives,* held that courts should not apply a bright line rule of statistical significance in considering what would be material to an ordinary investor under the Exchange Act. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 40, 131 S. Ct. 1309, 1319, 179 L. Ed. 2d 398 (2011). *Matrixx Initiatives* addressed the materiality of non-statistically significant adverse information regarding a medical product, and found that failure to disclose non-statistically significant instances of adverse events can be materially misleading. *Id.* Because

24

medical practitioners and the FDA often do consider non-statistically significant evidence in determining whether there is a link between a drug and an adverse effect, it follows that an investor might similarly consider such evidence relevant.

As the Eleventh Circuit noted, *Matrixx* rejected any bright line rule for statistical significance in evaluating materiality, not just in the medical context. *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1249 (11th Cir. 2012). Likewise, lower courts have held that "information may become material even in the absence of statistically significant evidence in light of other" indications of falsity. *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 210 (S.D.N.Y. 2008). In this instance, the complaint establishes 1) that Trulieve used facilities that created a known risk of mold contamination, particularly in a climate such as Florida; 2) there were multiple public customer complaints of mold contamination; 3) at least one customer complaint of mold presented a sufficient safety or reputational risk to Trulieve that Trulieve initiated a voluntary recall. Taken together these facts present a more than plausible inference that Trulieve's products suffered from mold issues due to its use of hoop houses. In a similar case, the Northern District of California found that a complaint successfully alleged a material misstatement when Defendants made positive statements about the quality of its product despite undisclosed complaints about adverse reactions to a product, and the subsequent recall of that product. *In re Terravia Holdings*, Inc. Sec. Litig., No. 16-CV-06633-JD, 2020 WL 553939, at *4

25

(N.D. Cal. Feb. 4, 2020). Here, similarly, the instances of mold and recall demonstrate the materiality of the failure to disclose the use of hoop houses.

The case law that Defendants rely on are not to the contrary. *In re Carter Wallace* merely held that, having made positive statements about an ongoing clinical trial, Defendants are not obligated to report on undesirable developments during the clinical trial that are not statistically significant. *In re Carter–Wallace Inc. Sec. Litig.*, 150 F.3d 153, 157 (2d Cir.1998)[1]. But that case is hardly analogous to the facts here. The Complaint does allege that Defendants had a freestanding duty to report on instances of mold, but that they had a duty to accurately characterize the facilities they were using so as not to falsely downplay the risk of mold contamination. *Oran v. Stafford* similarly held merely that isolated adverse reports, standing alone, do not create an affirmative duty of disclosure to render previous optimistic statements of a drug trial not misleading. *Oran v. Stafford*, 226 F.3d 275, 284 (3d Cir. 2000). It therefore is not analogous to the claims in this case – that the instances of mold are consequences of an underlying undisclosed issue – Trulieve's use of hoop houses. And to the extent that any of the cases that Defendants cite do create a bright line rule of statistical significance, they have been overturned by the Supreme Court's decision in *Matrixx Initiatives*, and are therefore

---

[1] Notably, the Ninth Circuit's decision in *Matrixx Initiatives*, which the Supreme Court affirmed, criticized *Carter-Wallace* for imposing an improper bright-line standard. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009), aff'd, 563 U.S. 27, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011)

26

outdated. *Matrixx Initiatives, Inc.*, 563 U.S. 27.

### 3.    The Complaint Properly Alleges that Defendants Failed to Disclose Related Party Transactions and Omitted Material Facts About Related Party Transactions.

### C.    The Complaint Alleges Undisclosed Related Party Transactions

Defendants challenge Plaintiffs' allegations regarding related party transactions by pointing out that Trulieve conformed to IFRS (International Financial Reporting Standards Foundation) accounting standards, rather than US GAAP. Yet what Defendants fail to do is acknowledge that the IFRS also requires the same disclosure of related party transactions.  IAS 24, attached as Exhibit 2 to the Stern Dec., is the accounting standard that governs such disclosures.  It requires reporting of related party transactions and defines a related party as, inter alia,

> a person or entity that is related to the entity that is preparing its financial statements (in this Standard referred to as the 'reporting entity').

> (a) A person or a close member of that person's family is related to a reporting entity if that person:
>
> (i) has control or joint control of the reporting entity;
>
> (ii) has significant influence over the reporting entity; or
>
> (iii) is a member of the key management personnel of the reporting entity or of a parent of the reporting entity.

IFRS 24, ¶10

27

A *related party transaction* is a transfer of resources, services or obligations between a reporting entity and a related party, regardless of whether a price is charged.

*Id.*

Notably, there is no minimum dollar amount required for disclosure. Despite these mandated disclosure requirements, Defendants concealed related party transactions from investors. ¶25. Track V LLC issued a $6m loan in January 2018 to Trulieve. This loan is listed as belonging to an unrelated party in Note 5 of the 2018 third quarter financial statements. ¶26. A corporate records search lists Virginia Hines as a director and registered agent of Track V. Virginia Hines was from May 2017 to May 2019 an in-house counsel for Trulieve and therefore was a related party at the time the financial statements at issue were prepared. *Id.* Note 5 of the 2018 third quarter financial statements lists another loan from Vandagraff One LLC as providing a $2 million loan on December 7, 2017. Vandergraff One LLC has the exact same address listed in its corporate records as Track V LLC, which is directly next door to a Trulieve-owned property in Clearwater, Florida. *Id.*

As a member of the in-house counsel team for Trulieve, there is a question of fact whether Ms. Hines has "significant influence" over Trulieve or "is a member of the key management personnel" of Trulieve. Defendants, despite pointing out that the IFRS applies to determining Trulieve's related party transactions, fail totally to address the definition of related party set forth in the IFRS.

28

Defendants also argue that failure to disclose any related party transactions are immaterial because the dollar value of those related party transactions was too small, and there is no evidence that they were anything other than arms length transactions.  However, even relatively small related party transactions are material to investors, especially when not disclosed, because related party transactions cannot be presumed to be at arms length. *Zagami v. Nat. Health Trends Corp.*, 540 F. Supp. 2d 705, 711 (N.D. Tex. 2008).  Defendants' reliance on *China Valves* does not support their position, since in that case the related party transaction at issue was a mere $322,725, significantly smaller than the $8 million at issue here, and it was unclear whether the transaction was actually a related party transaction at all due to the complaint in that case's lack of clarity about timing. *In re China Valves Tech. Sec. Litig.*, No. 11 CIV. 0796 LAK, 2012 WL 4039852, at *7 (S.D.N.Y. Sept. 12, 2012).

### D.     The Complaint Alleges Scienter

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007), the Supreme Court held that courts must engage in a comparative inquiry to determine whether the plaintiff has alleged facts giving rise to an inference of scienter. "[T]he inference defendants acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre." *Id.* at 324. Instead, a complaint will survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as

any opposing inference one could draw from the facts alleged." *Id.* The court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 310 (emphasis in original).

The court must review "all the allegations holistically." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011) (*quoting Tellabs*, 551 U.S at 326) (quotation marks omitted). The conclusion rests "not on the presence or absence of certain types of allegations, but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Slayton v. Am. Express Co.*, 604 F.3d 758, 775 (2d Cir. 2010) (quotation omitted); *see also Inst. Inv. Group v. Avaya, Inc.*, 564 F.3d 242, 269, 273 (3d Cir. 2009) (endorsing a "practical," "common-sense," "holistic" approach). Where an inference of scienter is at least "equally as compelling as any alternative inference," the "tie favors the plaintiff." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (emphasis added); *see also ACA Fin. Guar. Corp. v. Advest Inc.*, 512 F.3d 46, 59 (1st Cir. 2008) ("*Tellabs* now awards the draw to the plaintiff.").

In this Circuit, a strong inference of scienter arises with a showing of actual knowledge or severe recklessness. *In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1365 (N.D. Ga. 2002), *aff'd sub nom., Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004). Severe recklessness, or an "extreme departure

30

from the standards of ordinary care," presents "a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* at 1365 (quotation omitted).

As mandated by *Tellabs*, to determine whether allegations give rise to a strong inference of scienter, the Court examines them in the aggregate. See *Phillips*, 374 F.3d at 1017. Though not dispositive, a defendant's motive to commit fraud is relevant. See *Matrixx Initiatives*, 131 S. Ct. at 1324; *In re JDN Realty Corp. Sec. Litig.*, 182 F. Supp. 2d 1230, 1243 (N.D. Ga. 2002); *cf. Bryant v. Avado Brands*, Inc., 187 F.3d 1271, 1285-86 (11th Cir. 1999) (finding that motive and opportunity alone do not suffice to plead scienter, but that "motive and opportunity are specific kinds of evidence, which along with other evidence might contribute to an inference of recklessness or willfulness"). Scienter also may be inferred from circumstantial evidence. *See In re PSS World Med.*, 250 F. Supp. 2d at 1344.

The fact that the fraud involves statements regarding whether 1.2 million out of 1.7 million square feet of Trulieve's growing facilities contained basic climate control capabilities supports an inference of scienter. Under similar circumstances, courts have held that when misstatements concern a company's core operation, scienter may be imputed to top officers. *Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1226 n.3 (S.D. Fla. 2007); *In re Netbank, Inc. Sec. Litig.*, No. CIV.A.1:07-CV-2298, 2009 WL 2432359, at *5 (N.D. Ga. Jan. 29, 2009) (sustaining securities

complaint where misstatements occurred in company's core business); *In re Winstar Communications*, No. 01 CV 3014, 2006 WL 473885, *7 (S.D.N.Y. Feb. 27, 2006) ("Where accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties may be imputed to the company's officers and directors who are involved in day-to-day operation of the company.") (citation omitted); *In re Clarus Corp. Sec., Litig.*, 201 F. Supp. 2d 1244, 1251 (N.D. Ga. 2002). *Cf. In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1170 (S.D. Fla. 2004) (where allegations did not concern core business, scienter not plead sufficiently). In this case, Defendants made statements concerned a majority of their physical facilities, and it therefore strains credulity that a CEO or CFO of a company in the business of growing agricultural products would not be aware of whether their facilities for growing such products contained climate control capabilities or not.  Defendants cannot with a straight face argue that they were innocently unaware of whether or not their buildings had basic climate control technology such as air conditioners.

### 1.    Trulieve's Related Party Transactions with Rivers' Husband Create a Motive for Rivers to Commit Fraud

The Complaint identifies a strong motive for Rivers to commit fraud – it allowed her to enter into related party transactions with her husband that charged Trulieve the typical costs associated with building greenhouses, while supplying Trulieve with much cheaper hoop houses.  Disclosed or undisclosed, related party

transactions "are viewed with extreme skepticism in all areas of finance." *McCurdy v. S.E.C.*, 396 F.3d 1258, 1261 (D.C. Cir. 2005); *see also* Martin v. Altisource Residential Corp. (D.V.I. Mar. 16, 2017) (finding that disclosed related party transactions created motive to commit fraud). Thus, while the transactions between Trulieve and entities controlled by Rivers' husband were not undisclosed, the fact that the misstatements alleged in the complaint concern the nature of those transactions creates a motive to commit fraud. Thus, there is no merit to Defendants' claim that the Complaint only mentions the transactions with Rivers, husband, J.T. Burnette, merely because he is awaiting trial on federal racketeering and extortion charges before this Court. Rather, these transactions create a strong inference of motive. Specifically, Trulieve purchased property from One More Wish LLC at a price that far exceeded One More Wish's purchase price. Trulieve claimed that they were justified in paying this increased price due to improvements in the land. Thus, by exaggerating the level of improvements that were in fact made, by claiming that One More Wish installed greenhouses instead of hoop houses. Rivers could justify paying an inflated price. Companies affiliated with Rivers' husband also received over $30.0 million from Trulieve, purportedly for construction work ,creating further motive to mislead investors about the work that his construction firm actually did.

Further supporting these motive allegations is that while records show that

33

Trulieve paid One More Wish LLC  $2,170,000 for a property that One More wish purchased less than two years prior for merely $1,200,000, state records also show no improvements to the property that could justify an increased purchase price. Defendants assert that this fact should be given no weight because these records are somehow unreliable, despite the fact that their memorandum points to a website that states that "the Property Appraiser makes every effort to produce the most accurate information possible."  Def. Br. at 21.   Defendants' conclusory assertion that "Trulieve's improvements to the property would not be accounted for tax assessment purposes and would not show up in the property records" is backed by no citation to Florida tax law or regulations.  Defendants give no basis why these records are insufficient for pleading purposes to plausibly allege that Trulieve overpaid for property in a related party transaction.

### E.    The Complaint Alleges Control Person Liability

Because, as set forth above, the Complaint alleges a primary violation, and because Defendants do not challenge that the individual defendants are control people of Trulieve, the control person liability allegations should be sustained

## IV.    Conclusion

For the foregoing reasons, the motion to dismiss should be denied in its entirety. If the motion to dismiss is granted, Plaintiffs seek leave to replead.

34

Dated:         October 26, 2020          **THE ROSEN LAW FIRM, P.A.**

/s/ Jonathan Stern
Jonathan Stern, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

***Lead Counsel for Lead Plaintiffs and the
Putative Class***

35

**LOCAL RULE 7.1(F). CERTIFICATE OF COMPLIANCE**

The undersigned counsel certifies that the text of the foregoing memorandum of law comprises 7,035 words, excluding parts excluded under LR 7.1(F), according to the word count provided by Microsoft Word (Office 365) word processing software.

*/s/ Jonathan Stern*
Jonathan Stern