**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | |
|---|---|
| MONICA ACERRA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TRULIEVE CANNIBS CORP., et al.,<br><br>Defendants. | Master File No. 4:20cv186-RH-MJF<br><br><br>Hon. Robert L. Hinkle<br><br>**Jury Trial Demanded** |

**Memorandum of Law in Opposition to Motion to Dismiss Second Amended Complaint**

**Table of Contents**

I.    Introduction ...................................................................................................1

II.   Background ...................................................................................................3

    A.    Factual Background..................................................................................3

        1.    Industry Background ...................................................................3

        2.    History of Trulieve ......................................................................4

        3.    Trulieve's True Operation – Low Quality Outdoor Hoop Houses ............7

        4.    The Truth Begins to Emerge ...................................................14

    B.    Procedural Background ..................................................................15

    C.    Additional Factual Allegations in the SAC....................................16

III.   Argument ...................................................................................................18

    A.    The Second Amended Complaint Identifies Materially Misleading Statements ...................................................................................................18

        1.    Trulieve's Statement on their website that their products are grown in a "climate-controlled environment" was materially misleading ........................18

        2.    Rivers' Statement that statement that "[t]o get the highest quality product in Florida's climate, we wanted to control the environmental factors" was materially misleading ...................................................................................22

        3.    The Statement that Trulieve was "working to increase greenhouse capacity" was materially misleading ...............................................................23

    B.    The Complaint Alleges Scienter ...............................................24

IV.   The Complaint Alleges Control Person Liability...........................................27

V.    Conclusion ...................................................................................................28

## **Table of Authorities**

Cases

*ACA Fin. Guar. Corp. v. Advest Inc.*, 512 F.3d 46 (1st Cir. 2008) .........................25

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999)........................ 18, 21

*Bryant v. Avado Brands*, Inc., 187 F.3d 1271, 1285-86 (11th Cir. 1999) ..............26

*Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307 (11th Cir. 2019) ..............................24

*FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282 (11th Cir. 2011) .................19

*Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006) ............................18

*In re JDN Realty Corp. Sec. Litig.*, 182 F. Supp. 2d 1230 (N.D. Ga. 2002) ...........26

*In re LDK Solar Secs. Litig.*, 584 F. Supp. 2d 1230 (N.D. Cal. 2008)....................18

*In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335 (M.D. Fla. 2002)....26

*In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351 (N.D. Ga. 2002).. 25, 26

*Inst. Inv. Group v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009).........................25

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009)..................................25

*Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). ..........................18

*Sec. & Exch. Comm'n v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968).....19

*Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010).....................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).................. 18, 24

## I.    Introduction

As the Second Amended Complaint (the "SAC") states, Defendant Trulieve Cannabis Corp, Inc. ("Trulieve") is a medical marijuana company based in Florida that informed investors, through its website, that "Trulieve products are hand-grown and specially cultivated in a state-approved, climate-controlled environment". Similarly, Rivers stated, in a magazine interview, that it was important for Trulieve's business to grow their products in an environmentally controlled environment. However, in reality, Trulieve grows most of its product in non-climate-controlled "hoop houses" that cannot deliver the same level of product quality and product safety as climate-controlled facilities.

The Consolidated Amended Complaint (the "CAC"), by contrast, focused on Trulieve's statement that they used "greenhouse style" grows.  The Court found that the CAC failed to establish that investors would have understood Trulieve's references to "greenhouse style" to refer unambiguously to climate-controlled facilities. The SAC removes any ambiguity, focusing on unambiguously false statements – Trulieve directly claimed that it grows products in climate-controlled facilities, and that it is important to Trulieve to do so. The SAC also remedies the deficiencies the Court identified in alleging scienter. As the SAC states, Rivers said in an interview that controlling environmental factors was important to Trulieve's business. She also made a statement that nearly verbatim echoed Trulieve's false

1

statement on its website that Trulieve grows its products in a climate controlled environment, rendering it implausible that she was unaware that her company's website was echoing her own misleading statement.

In moving to dismiss the SAC, Defendants, disregarding the plain meaning of their own words, claim that when they said they grow their products in a climate-controlled environment, they did not mean *all* of their products. In context, Defendants claim, ordinary investors would have understood that when Trulieve and Rivers discussed using climate-controlled facilities, this only referred to the facilities they used to grow smokable flower, not the facilities used to grow material used for creating extracts. Beyond the fact that this is not how any ordinary investor would have read Defendants' unqualified statements that they used climate-controlled facilities to grow their products, Defendants interpretation is impossible given that, at the time they made the statements regarding climate control, they could not legally sell smokable flower, and therefore any discussion of their products must refer to concentrates.

Defendants' attempts to challenge scienter fare no better. Defendants claim there is no evidence that Rivers was aware of the misleading language on Trulieve's website. But the fact that Rivers herself made a nearly identical statement months before the class period began indicates she was fully aware of the website's language.

2

## II.     Background

### A.     Factual Background

#### 1.       Industry Background

Cannabis is a genus of flowering plant that naturally contains a variety of chemicals called cannabinoids. ¶29.[1] Several cannabinoids, most notably Tetrahydrocannabinol ("THC"), are psychoactive, and are concentrated in the flower of the cannabis plant. *Id.* The amount of THC contained within a particular cannabis plant varies according to the strain of plant used as well as the growing environment, particularly the amount of ultraviolet light that a plant is exposed to. *Id.*

Also important to the growing of marijuana is climate control, particularly the control of humidity. ¶30. Excess humidity can cause mold to grow on marijuana flowers, according to The Weed Blog, a website containing news and information about the marijuana industry. *Id.*

Consumption of marijuana mold can be deadly for people with a compromised immune system or severe respiratory problems, and among healthy people can cause coughing, wheezing, stuffy nose, itchy eyes, fever, shortness of breath, memory loss, or lethargy, according to the medical marijuana website Green

---

[1] Unless otherwise specified all references to ¶_ are to the SAC.

3

Health Docs. ¶31. Marijuana mold also degrades cannabinoids in marijuana flower, reducing the potency of the product. *Id.* As the University of Florida Institute For Agricultural Studies Extension notes, mold thrives in humid environments, and Florida is humid throughout much of the year. *Id.* In order to prevent excess humidity and to otherwise control the climate in which marijuana grows, marijuana cultivators typically cultivate marijuana in indoor facilities, or in outdoor greenhouses that use natural light but contain climate control equipment to regulate temperature and humidity. *Id.*

### 2.    History of Trulieve

Trulieve describes itself as a vertically integrated "seed to sale" cannabis business, meaning that they grow, distribute and sell to the end user cannabis products. ¶33. Trulieve sells marijuana products in the State of Florida, which legalized the consumption of marijuana for medical purposes with the passage of Florida Amendment 2 in 2016. ¶34. Under Amendment 2, a patient may only consume marijuana with a doctor's recommendation for the treatment of cancer, epilepsy, glaucoma, positive status for human immunodeficiency virus (HIV), acquired immune deficiency syndrome (AIDS), post-traumatic stress disorder (PTSD), amyotrophic lateral sclerosis (ALS), Crohn's disease, Parkinson's disease, multiple sclerosis, chronic nonmalignant pain caused by a qualifying medical condition or that originates from a qualified medical condition, or other comparable

4

debilitating medical conditions. *Id.* Initially, Florida regulations under Amendment 2 prohibited the smoking of marijuana, requiring that it be consumed by some other means. *Id.* The Florida legislature repealed this restriction in March of 2019. *Id.*

The predecessor company to Trulieve, Trulieve, Inc. received approval from the Florida Department of Health to begin cannabis cultivation on February 26, 2016. ¶35. On July 19, 2016, Trulieve, Inc. received approval to begin processing activities. *Id.* On July 20, 2016, Trulieve, Inc. received approval to begin dispensing products. *Id.* On July 23, 2016, Trulieve, Inc. became the first company to sell medical marijuana products in Florida via home delivery. *Id.* Three days later, Trulieve, Inc. opened the first medical marijuana dispensary in Florida. *Id.*

On July 18, 2018 Trulieve Inc. and Schyan Exploration Inc. entered into a letter agreement to merge the two companies resulting in a reverse takeover of the company by Trulieve. ¶36. That merger was completed, resulting in the formation of Trulieve, and at the same time, on September 25, 2018, Trulieve filed a listing statement with the Canadian Securities Exchange, allowing Trulieve to list on that exchange. *Id.* Trulieve began trading on the OTC Pink market at the same time, and on August 6, 2019 graduated to the OTCQX Best Market. *Id.*

Trulieve sells two types of cannabis products: "flower" products, which contain unprocessed marijuana plant matter from the cannabis flower, and products containing THC concentrates. ¶37. Concentrates, as the name implies, are oil based

5

extracts containing high concentrations of THC oil. *Id.*

Trulieve claims that it grows its cannabis in two types of facilities: indoor facilities and outdoor greenhouses. ¶38. Trulieve has stressed the importance of climate control to a successful grow operation. *Id.*

> In its cultivation activities, Trulieve uses data analytics to record, monitor, communicate and optimize the yield potential of each harvest of cannabis by strain. Daily logs are recorded on a cloud-hosted database to capture such metrics as nutrient application, temperature, humidity, CO2 levels, light intensity, light duration, grow medium pH and grow medium Electro-Conductivity (EC) at various locations within each growing room. Trulieve considers these data sets as the harvest vitals that are continuously monitored to ensure peak performance of each strain maintained by Trulieve. At harvest, the cultivation log is paired with the room's daily log and analyzed against previous harvests of the same strain in an effort to ensure consistency of products.

Since at least June of 2017 Trulieve has maintained, on its website, a page providing information to physicians. ¶39. It includes the following passage, stating that "Trulieve products are hand-grown and specially cultivated in a state-approved, climate-controlled environment to ensure purity and safety. We leave nothing to chance while letting nature do her work." *Id.*

6



**FOR PHYSICIANS**

Trulieve products are hand-grown and specially cultivated in a state-approved, climate-controlled environment to ensure purity and safety. We leave nothing to chance while letting nature do her work.

On April 18, 2018, Trulieve issued a press release summarizing an interview with Kim Rivers regarding Trulieve's operations. ¶40. It stated in part "Trulieve, the first fully-licensed cannabis business in Florida, grows the plant in a climate-controlled environment in compartments that enable them to control plant health and growth one-on-one as opposed to growing marijuana in a massive space." *Id.*

On September 28, 2018, 850 Business Magazine published an article by Michael Moline describing a tour of Trulieve's indoor growing facility and an interview with Rivers. ¶41. Rivers stated "To get the highest quality product in Florida's climate, …we wanted to control the environmental factors." *Id.*

### 3.    Trulieve's True Operation – Low Quality Outdoor Hoop Houses

The term "hoop house" refers to rudimentary growing structures that, unlike greenhouses, lack climate control features. ¶43. As the website Sustainable Agriculture Research and Education explains, High tunnels, or hoop houses, are simple structures over bare ground that are nothing more than a thin plastic film roof that are open to the elements on the sides, and that lack the elaborate heating

7

and cooling systems of a greenhouse. *Id.*

Trulieve's hoop houses are made of cheap plastic film covering just the top or roof and are open at the sides. ¶44. Trulieve is not able to maintain the temperature or humidity of its hoop houses because they are open to the elements. *Id.* This makes it impossible for Trulieve to control the temperature or humidity of its hoop houses. *Id.* Greenhouses are solid structures made of glass roofs and glass walls and are completely enclosed on all four sides, so that the temperature and humidity may be maintained within a desired range. *Id.*

The investment firm Grizzly Research ("Grizzly") has issued a report (the "Grizzly Report") revealing that Trulieve did not actually use greenhouses as it claimed, but actually relied on hoop houses. ¶45. Grizzly provided the following photos:

8







As noted above, the use of hoop houses is unsuitable for growing cannabis in a humid location such as Florida because it is impossible for Trulieve to maintain the temperature and humidity of the hoophouses within the necessary ranges. ¶46. As a result, Trulieve has sold marijuana products contaminated by mold on several occasions. *Id.* The Grizzly report found one sample of Trulieve flower containing such mold:

11



Internet research has revealed many other customers having issues with mold. The facebook account "420watchdog" posted the below screenshot on June 10, 2020 revealing that Trulieve recalled a batch of "Blue Sunshine" flower due to customer complaints of mold. ¶47.

**Kevin :** Quality and patient safety are our highest priorities. Blue Sunshine batch DUFL-BLD-24-PK-4 has been reported on social media to have mold however, internal and 3rd party lab test results do not indicate mold contamination. Out of an abundance of safety precautions, it has been pulled from shelves at all locations. As a reminder, Trulieve product may be exchanged at any time and for any reason. 3rd-party lab reports are available for each and every batch of Trulieve products on our website here: https://www.trulieve.com/patients/product-test-search

8:55

**:** So should I return or do u think it's safe for me to smoke

8:56

**Kevin :** That is up to you!

8:57

On January 14, 2020, a user of the website reddit reported purchasing Trulieve flower of the "white buffalo" strain that was contaminated by mold and caused him to be hospitalized for breathing issues and caused him to experience

13

delirium. ¶48.

### 4.    The Truth Begins to Emerge

On December 17, 2019, while the market was open, Grizzly published the Grizzly Report published a report explaining that the vast majority of the Company's marijuana was produced in low quality hoop houses producing inferior mold-ridden product. ¶68.

> When we visited [Trulieve's facility], we found a huge row facility with 9 foot chain linked fences with barbed wire at the top, security cameras and armed guards. Hackney nursey is in Quincy, we were told by locals that Trulieve has hired about half of the small town. All the facilities have just gone up in the past year, and they flew a grow expert in from California to oversee the operation.

> We estimate this area of hoop houses to cover at least 430,000 and 1,010,000 square feet per location, which would combined make up the vast majority of Trulieve's cultivation surface. We believe that Trulieve has been supplementing if not getting most of their marijuana supply from these low-quality outdoor production hubs.

> Florida is the most humid state in the U.S. Tallahassee has an average humidity level of 75% which is too high for every step of cannabis growth. While cannabis plants don't usually die from the heat, too hot temps will cause plants to grow much more slowly.

> Trulieve's government-mandated obligation to the medical patients of Florida is to provide a safe, clean, and efficacious offering of medical cannabis treatment options. Cultivation of safe and high-quality cannabis in a humid, equatorial microclimate such as Florida requires careful selection of genetics, environmental controls, IPM (integrated pest management), and harvesting practices. The aforementioned

14

variables are critically interconnected whether you are cultivating indoors in an enclosed warehouse, in an enclosed greenhouse, or in Trulieve's case, a large tranch of open hoophouses.

As Florida is the most humid state in the U.S. it is a geographical outlier within the greater United States. If one is to cultivate cannabis exposed to the local environment, careful care must be taken to cultivate cannabis genetics that are acclimated to the local microclimate and to provide specialized, vigilant protection to plants throughout the growth cycle. If hoop house cultivation is quickly and reactively implemented to supplement low performance at existing warehouse facilities, the outcome will most likely be a low quality and in this case, dangerous end product.

Many plant diseases conducive to Florida's humid environment greatly increase health risks to humans when consumed, namely *Botrytis cinerea* (grey mold). Combusting and/or inhaling grey mold can worsen symptoms of asthma and induce lung infections along with multiple autoimmune diseases (of which many are qualifying conditions to become a Florida medical cannabis patient, in a bit of tragic irony).

¶69.

On this news, shares of Trulieve fell $1.51 per share or over 12.6% to close at $10.40 per share on December 17, 2019, damaging investors. ¶71.

## B. **Procedural Background**

In the Order, the Court dismissed the CAC on the grounds that it failed to identify a false or misleading statement. The Court held that the CAC did not adequately allege that it was misleading to refer to Defendants' non-climate controlled hoop houses as "greenhouse style". Order at 11. The Court found that a

15

reasonable investor would not necessarily believe that a structure *must* be climate controlled in order to qualify as a greenhouse. The Court also found that the use of "greenhouse style" was an indication that it was not attempting to meet a formal definition of a greenhouse. The Order rejected the argument that Defendants' stressing of the importance of climate monitoring created a context where an investor would believe that the facilities were climate controlled, finding that climate monitoring is distinct from climate control. *Id.* at 12. The Order also found that the CAC failed to allege scienter.

### C.    Additional Factual Allegations in the SAC

The CAC identifies three statements by Trulieve that specifically assert that climate control is important to Trulieve's operations and that Trulieve grows its products in climate-controlled facilities.

First, the CAC states that since at least June of 2017 Trulieve has maintained, on its website, a page providing information to physicians. ¶39. It includes the following passage, stating that "Trulieve products are hand-grown and specially cultivated in a state-approved, climate-controlled environment to ensure purity and safety. We leave nothing to chance while letting nature do her work." ¶40.

16

Second, the CAC states that on April 18, 2018, Trulieve issued a press release summarizing an interview with Kim Rivers regarding Trulieve's operations. ¶40. It stated in part "Trulieve, the first fully-licensed cannabis business in Florida, grows the plant in a climate-controlled environment in compartments that enable them to control plant health and growth one-on-one as opposed to growing marijuana in a massive space." ¶40.

Third, on September 28, 2018, 850 Business Magazine published an article by Michael Moline describing a tour of Trulieve's indoor growing facility and an interview with Rivers. ¶41. Rivers stated, "To get the highest quality product in Florida's climate, …we wanted to control the environmental factors." ¶41.

These statements, taken together, establish that Trulieve deliberately informed investors and the public that they grew their products in climate-controlled facilities.

The SAC also includes additional allegations establishing the domestic nature of Plaintiffs' transactions. Defendants do not contest, and therefore concede, that these additional allegations satisfy the requirements of *Morrison v. National*

17

*Australia Bank Ltd.*, 561 U.S. 247 (2010).

### III.    Argument

In a PSLRA case, as on any motion to dismiss, the Court must accept all well-pled factual allegations as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "The PSLRA in no way turns FRCP 12 into a trial-type, papers-only proceeding, much less one in which defendants get the benefit of every conceivable doubt, including credibility calls." *In re LDK Solar Secs. Litig.*, 584 F. Supp. 2d 1230, 1260 (N.D. Cal. 2008). "To allege securities fraud under Rule 10b–5, a plaintiff must show: 1) a misstatement or omission, 2) of a material fact, 3) made with scienter, 4) on which plaintiff relied, 5) that proximately caused his injury." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir. 1999). Under the PSLRA, to plead falsity, a Complaint must  "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).

### A.    The Second Amended Complaint Identifies Materially Misleading Statements

#### 1.    Trulieve's Statement on their website that their products are grown in a "climate-controlled environment" was materially misleading

Defendants' statement that Trulieve grew their product in a climate-

18

controlled environment plainly informed investors that Trulieve grew *all* of their product in a climate-controlled environment. To determine whether a statement is false and misleading under the Securities Exchange Act, "the 'appropriate primary inquiry' is 'into the meaning of the statement to the reasonable investor and its relationship to truth.'" *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011), *quoting Sec. & Exch. Comm'n v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 863 (2d Cir. 1968). A reasonable investor would have interpreted the statement that Trulieve grew their products in a climate-controlled environment as a claim that they grew *all* of their product in a climate-controlled environment. Defendants concede that they grow a large amount of product in non-climate-controlled hoop houses. Therefore, this statement was misleading to a reasonable investor.

Defendants' claim that Trulieve's other regulatory filings provide necessary context for their statement misconstrues the law and the facts. Defendants argue that because Trulieve's regulatory filings disclosed that Trulieve used "greenhouse style" grows, it informed investors that some of its facilities were not climate controlled. Defendants cite to the Order, but misconstrue it. The Order stated that the CAC failed to establish that "a structure *must* be climate-controlled to qualify as a greenhouse" and that the use of greenhouse was "plainly not an attempt to meet any specific or formal definition of a greenhouse." Order at 11 (emphasis added).

19

But Defendants do not dispute the fact that greenhouses often, or even typically, are climate controlled. Therefore, even if the phrase "greenhouse style" does not on its own lead investors to believe that Trulieve used climate controlled facilities, Trulieve's use of "greenhouse style" also did not put investors on notice that Trulieve's "greenhouse style" facilities were *not* climate controlled. Rather, because Trulieve stated on its website that the Company used a "climate controlled environment", investors would reasonably believe that any greenhouse style grow was in fact climate controlled.

Defendants' argument that their misstatement is immaterial is without merit. Defendants claim that the SAC provided no facts supporting materiality, other than the previously alleged reports of recalls of moldy product. Defendants quote the Order, stating that Plaintiffs must show "something more" with respect to the mold allegations, but their reliance on the Order misconstrues the context. The Court held that the CAC must allege something more with respect to the mold allegations in order to show that failure to disclose the mold recall was a material omission, not to allege the materiality of any misstatement about climate controlled facilities. Order at 12.

Defendants also point to a purported "Trulieve Fact Sheet" as negating any inference of materiality, but their reliance on this is improper. Defendants point out that the Trulieve Fact Sheet claims that non-climate controlled grows were only

20

used to produce product for oil extracts, and that there is no concern with mold contamination because Trulieve's process for extraction removes any impurities associated with mold. Defendants published this "fact sheet" in an effort to rebut the allegations of fraud in the Grizzly Report. This argument is improper because it seeks to take judicial notice of Defendants own exculpatory statements for the truth of the matters asserted. The Eleventh Circuit has held that SEC filings are judicially noticeable in a securities fraud case not "the truth of their contents but only to determine what the documents stated." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277 (11th Cir. 1999). Therefore, while the Court may take judicial notice of what Trulieve claimed in the Fact Sheet, it is improper for the Court to take the contents of the Fact Sheet as true.

In reality, Defendants' own statements provide ample grounds to find that a reasonable investor would have concluded that growing product in a climate-controlled environment was material. On April 18, 2018, a Trulieve press release stated that they "[g]row the plant in a climate-controlled environment in compartments that enable them to control plant health and growth one-on-one as opposed to growing marijuana in a massive space." Similarly on September 28, 2018, Rivers stated that "to get the highest quality product in Florida's climate, … we wanted to control the environmental factors." Trulieve's website states that climate controlled grows ensure purity and safety. Defendants might argue that

21

these statements should be understood as only referring to growing smokable flower, not material for extracts, but they can point to no statement *during* the class period where they stated that climate-controlled growing is only important for smokable flower. Moreover, the two 2018 statements could not possibly be discussing smokable flower because, as of that time, Trulieve did not and could not legally produce and sell smokable flower. As Defendants themselves note in the motion to dismiss, "[b]efore March 2019, Florida did not allow for smokable cannabis…. Before then, Trulieve sold only oil-based products…." Because oil based products were the *only* products that Defendants could sell legally when they made the above statements, an investor could only have interpreted those statements as stressing the importance of climate control for the production of marijuana for oil based products. As the Motion to dismiss stated "[i]nvestors understood that before March 2019, the cannabis Trulieve grew and cultivated was processed from raw cannabis to oil and concentrate-based products." But it follows from that fact that when, in 2018, Rivers and Trulieve emphasized the importance of climate controlled facilities, investors would have understood these statements as relating to the growing of cannabis for oil production.

**2.   Rivers' Statement that statement that "[t]o get the highest quality product in Florida's climate, we wanted to control the environmental factors" was materially misleading**

Rivers' statement in 850 Business Magazine that "[t]o get the highest quality

22

product in Florida's climate, we wanted to control the environmental factors" was materially misleading to an ordinary investor. This statement failed to disclose that a majority of Trulieve's facilities were not climate controlled. As Defendants note, the article in question includes a description of a tour of Trulieve's indoor growing facilities. Defendants claim that this establishes that Rivers was only discussing that particular facility. However, nothing about River's quoted statement from a "recent interview" indicates she was referring to the indoor facility only. In fact, it makes no sense to read this discussion as referring only to the particular facility where the tour took place. Rivers claimed that climate control was important for growing cannabis products in Florida. Since all of Trulieve's growing facilities are in Florida, this statement applies equally to all of Trulieve's growing facilities.

### 3.    The Statement that Trulieve was "working to increase greenhouse capacity" was materially misleading

Defendants' statements in their regulatory filings that they were increasing greenhouse capacity was misleading because, unlike the statement that it uses greenhouse *style* grows, the statement regarding greenhouse capacity does not qualify its description. Defendants claim that, because the paragraph that included the statement about greenhouse capacity also included a statement about "greenhouse style grows" in context a reasonable investor would have understood that Defendants' statements about greenhouse capacity was not meant in a technical

23

or precise sense. But, as the 11th Circuit has held, these statements must be read in context. *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1320 (11th Cir. 2019). And the Second Amended Complaint provides just such context. Since 2017, Trulieve maintained on its website that its products were grown "in a climate controlled environment to ensure purity and safety." ¶39. Trulieve also issued a press release on April 18, 2018 stating that it "grows the plant in a climate controlled environment in compartments that enable them to control plant health and growth one on one". ¶40. Thus, on September 25, 2018 when Trulieve claimed that they use "greenhouse style grows" and were "increasing greenhouse capacity" ¶53, a reasonable investor would have read that statement in conjunction with Trulieve's unqualified prior assertions that its facilities were climate controlled.

## B.     The Complaint Alleges Scienter

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007), the Supreme Court held that courts must engage in a comparative inquiry to determine whether the plaintiff has alleged facts giving rise to an inference of scienter. "[T]he inference defendants acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre." *Id.* at 324. Instead, a complaint will survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* The court must consider "whether all of the facts alleged, taken collectively, give rise to a strong

24

inference of scienter." *Id.* at 310 (emphasis in original).

The court must review "all the allegations holistically." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011) (*quoting Tellabs*, 551 U.S at 326) (quotation marks omitted). The conclusion rests "not on the presence or absence of certain types of allegations, but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Slayton v. Am. Express Co.*, 604 F.3d 758, 775 (2d Cir. 2010) (quotation omitted); *see also Inst. Inv. Group v. Avaya, Inc.*, 564 F.3d 242, 269, 273 (3d Cir. 2009) (endorsing a "practical," "common-sense," "holistic" approach). Where an inference of scienter is at least "equally as compelling as any alternative inference," the "tie favors the plaintiff." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (emphasis added); *see also ACA Fin. Guar. Corp. v. Advest Inc.*, 512 F.3d 46, 59 (1st Cir. 2008) ("*Tellabs* now awards the draw to the plaintiff.").

In this Circuit, if a complaint shows actual knowledge or severe recklessness, it establishes a strong inference of scienter. *In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1365 (N.D. Ga. 2002), *aff'd sub nom., Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004). Severe recklessness, or an "extreme departure from the standards of ordinary care," presents "a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the

defendant must have been aware of it." *Id.* at 1365 (quotation omitted).

As mandated by *Tellabs*, to determine whether allegations give rise to a strong inference of scienter, the Court examines them in the aggregate. See *Phillips*, 374 F.3d at 1017. Though not dispositive, a defendant's motive to commit fraud is relevant. See *Matrixx Initiatives*, 131 S. Ct. at 1324; *In re JDN Realty Corp. Sec. Litig.*, 182 F. Supp. 2d 1230, 1243 (N.D. Ga. 2002); *cf. Bryant v. Avado Brands*, Inc., 187 F.3d 1271, 1285-86 (11th Cir. 1999) (finding that motive and opportunity alone do not suffice to plead scienter, but that "motive and opportunity are specific kinds of evidence, which along with other evidence might contribute to an inference of recklessness or willfulness"). Scienter also may be inferred from circumstantial evidence. *In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1343 (M.D. Fla. 2002).

The Court can infer scienter from the fact that Rivers repeatedly spoke knowledgeably about Trulieve's use of, and the importance of, climate controlled facilities, and made a statement before the class period that mirrors the deceptive statement on Trulieve's website. Before the class period, Trulieve put out a statement summarizing an interview with Rivers and attributing to her the statement that "Trulieve, the first fully-licensed cannabis business in Florida, grows the plant in a climate-controlled environment in compartments that enable them to control plant health and growth one-on-one as opposed to growing marijuana in a massive

26

space." ¶40. Rivers similarly told 850 Business Magazine, on September 28, 2018 that "to get the highest quality product in Florida's climate, … we wanted to control the environmental factors."  This statement indicates that she was directly involved in the decisions about whether to employ climate control features in Trulieve's growing facilities. It therefore provides a strong inference that she was aware that Trulieve used non climate-controlled facilities.

Further supporting the inference of scienter was the fact that Rivers' pre-class period interview closely mirrored Trulieve's misleading claim on its website. Trlieve's website falsely states that "Trulieve products are hand-grown and specially cultivated in a state-approved, climate-controlled environment to ensure purity and safety. We leave nothing to chance while letting nature do her work." Rivers' interview states that "Trulieve, the first fully-licensed cannabis business in Florida, grows the plant in a climate-controlled environment in compartments that enable them to control plant health and growth one-on-one as opposed to growing marijuana in a massive space." The near identical phrasing creates a strong inference that she was aware of that language on the website and either was involved in crafting it or approved it.

## IV.   The Complaint Alleges Control Person Liability

Because, as set forth above, the Complaint alleges a primary violation, and because Defendants do not challenge that the individual defendants are control

27

people of Trulieve, the control person liability allegations should be sustained.

## V.    <u>Conclusion</u>

For the foregoing reasons, the motion to dismiss should be denied in its entirety. If the motion to dismiss is granted, Plaintiffs seek leave to replead.

Dated: June 9, 2021                              **THE ROSEN LAW FIRM, P.A.**

                                         /s/ Jonathan Stern
                                           Jonathan Stern, Esq.
                                           Laurence M. Rosen, Esq.
                                           275 Madison Avenue, 40th Floor
                                           New York, New York 10016
                                           Telephone: (212) 686-1060
                                           Fax: (212) 202-3827
                                           Email: lrosen@rosenlegal.com
                                           Email: pkim@rosenlegal.com

                                           *Lead Counsel for Lead Plaintiffs and the Putative Class*

29

**LOCAL RULE 7.1(F). CERTIFICATE OF COMPLIANCE**

The undersigned counsel certifies that the text of the foregoing memorandum of law comprises 5038 words, excluding parts excluded under LR 7.1(F), according to the word count provided by Microsoft Word (Office 365) word processing software.

*/s/ Jonathan Stern*
Jonathan Stern
